**HEALTHCARE SERVICES OF THE OZARKS, INC., d/b/a Oxford Healthcare, Respondent–Appellant,**

v.

**Pearl Walker COPELAND and Luann Helms, Appellants–Respondents.**

No. SC 87083.

Supreme Court of Missouri,
En Banc.

Aug. 8, 2006.

Rehearing Denied Sept. 12, 2006.

Thomas W. Millington, Springfield, for Appellants–Respondents.

Rick E. Temple, Springfield, for Respondent–Appellant.

Jean Paul Bradshaw, II, R. Kent Sellers, Kansas City, for Amicus Curiae, Missouri Hospital Association.

WILLIAM RAY PRICE, JR., Judge.

## I. Introduction

This is a consolidated appeal from a judgment that denied Healthcare Services of the Ozarks, Inc., d/b/a Oxford Healthcare (Oxford) recovery of damages on breach of contract claims in separate actions brought against former employees Pearl Walker Copeland and LuAnn Helms. The judgment, however, granted Oxford injunctive relief to enforce covenants not to compete executed by Copeland and Helms. The judgment also denied separate counterclaims by Copeland and Helms against Oxford that sought damages for tortious interference with business relationships with their new employer ASA Healthcare, Inc., d/b/a Integrity Home Care (Integrity), and a declaration that the covenants not to compete were unenforceable. The judgment is affirmed in part and reversed in part, and the case is remanded.

## II. Background

### A. Factual Background

The parties stipulated to the following facts. Copeland was hired by Oxford in 1979 and Helms was hired in 1996. Neither Copeland nor Helms had work experience in the home health service industry prior to employment by Oxford, although Helms had previously worked as a nurse. During their employment by Oxford, both had extensive contact with caseworkers with the Missouri Division of Aging (now the Missouri Division of Senior Services), clients, and other Oxford employees. While employed by Oxford, Copeland received her certificate of provider certification training.

Copeland signed a non-compete agreement June 1, 1993, and Helms signed a non-compete agreement September 2, 1997. Each was required to sign the agreement in order to continue their employment with Oxford.

Each agreement provided that for two years following separation from Oxford the respective employee would not "either directly or indirectly on [her] own account or as agent, stockholder, owner, employer, employee or otherwise, engage in a business competitive to that of [Oxford] within

a radius of 100 miles from Joplin, Missouri." Each agreement further provided that the employee would not "in any way divert or attempt to divert from [Oxford] any business or employees whatsoever" and that each employee would not "influence any of the customers or employees of [Oxford]" during the two-year period.

On January 21, 2000, Copeland and Helms each submitted a notice of resignation with an effective date of February 21, 2000. At the time of her resignation, Copeland's salary from Oxford was $40,974 per year with an opportunity for bonus. Helms' salary at the time of her resignation was $35,500 per year.

Although the stipulation does not contain an exact date that Copeland and Helms were hired by Integrity, soon after Copeland submitted her notice of resignation, she attended meetings and began working with others, including the Missouri Division of Aging, on behalf of Integrity. On January 31, 2000, Integrity requested a social services block grant from the Missouri Division of Aging to provide the same type of services as Oxford provides in the same counties in which Oxford does business. Integrity's request to the Division of Aging included Copeland's certificate of provider certification training in order to satisfy a regulatory requirement that Integrity have at least one certified manager in order to be awarded the block grant contract it sought. Integrity received a social services block grant from the Missouri Division of Aging on February 4, 2000.

Copeland and Helms attended meetings at the home of Integrity's owner, Greg Horton, in Springfield, Missouri, in late January and February 2000. Copeland set up an office in her home in February 2000, for the purpose of conducting Integrity business. Beginning in February 2000, Helms worked several hours each workday in Copeland's home for Integrity. Cope-

land allowed meetings called by others to be held in her home on February 10 and 13, 2000, with present and former employees of Oxford to solicit employees for Integrity. A team roster submitted by Integrity to the Missouri Division of Aging listed Copeland and Helms as two of four employees that were actively working on its behalf in its Joplin office as of February 24, 2000.

Beginning in February 2000, some of Oxford's employees resigned to accept employment with Integrity. Some of Oxford's clients served by the resigning employees then requested that the Missouri Division of Aging transfer their services to Integrity, and services for those clients were transferred.

Integrity replaced Copeland's certificate of provider certification training that had been filed with the Missouri Division of Aging with that of another Integrity employee by letter dated July 3, 2000. The letter was received by the Missouri Division of Aging July 7, 2000. All of Copeland's and Helms' activities on behalf of Integrity occurred within 100 miles of Joplin, Missouri.

At the conclusion of the trial, the trial court found the following facts in addition to those stipulated to by the parties. The trial court found that on January 21, 2000, when Copeland and Helms resigned their employment with Oxford, they were aware of their non-compete agreements; that notwithstanding their knowledge of the non-compete agreements, each made a conscious decision to assist with starting Integrity; and that Copeland and Helms consciously agreed to suffer the consequences that would follow.

### B. Procedural Background

Oxford's action against Copeland was filed February 16, 2000. Its action against Helms was filed March 10, 2000. The trial court entered temporary restraining or-

ders on February 24, 2000, and March 23, 2000, respectively, enforcing the non-compete agreements that Copeland and Helms had signed. Oxford posted two bonds of $7,500.00 to secure the restraining orders as to both Copeland and Helms.

On March 23, 2000, the trial court consolidated the separate actions against Copeland and Helms, and informally stayed the case at the defendants' request, to allow them to pursue a federal court action against the commissioner of the Internal Revenue Service and against Oxford. The federal court action sought a revocation of Oxford's tax-exempt status, damages under the Sherman Act,[1] and a declaration that the non-compete agreements were void. The federal court action was unsuccessful and was dismissed on January 11, 2001.

During the pendency of the federal court action, the trial court extended the temporary restraining orders against Copeland and Helms every 15 days. The restraining orders were continued in effect until April 2, 2001, although it appears that Copeland and Helms thought that the restraining orders were in effect until the non-compete agreements expired. The two-year period covered by the Copeland and Helms non-compete agreements ended February 4, 2002.

After the federal action was dismissed, Copeland and Helms resumed pursuit of their action in the circuit court. In March 2002, by way of amended pleadings, Copeland and Helms each asserted counterclaims against Oxford for tortious interference with a business expectancy and for declaratory judgment to the effect that Oxford, as a not-for-profit public benefit corporation, was not entitled to obtain or

enforce any non-disclosure or non-competition agreement that they may have signed.

Trial commenced January 8, 2004. At the time the case was tried, Copeland and Helms were employed by Integrity in Joplin, Missouri. The trial court found that the non-compete agreements were valid and enforceable and that Copeland and Helms each breached their non-compete agreement with Oxford, but that Oxford did not prove it was damaged as a result of the breaches of those agreements. The trial court also found that the restraining orders and injunctive relief that had been issued during the time the actions were pending were justified, had been issued properly and providently, and ordered the cash bonds posted by Oxford, together with interest accrued thereon, returned to Oxford. Finally, the trial court found against Copeland and Helms on both counts of their respective counterclaims against Oxford and assessed costs to Copeland and Helms. Judgment was entered in accordance with the trial court's findings. Copeland and Helms appeal and Oxford cross-appeals.

### III. Analysis

### A. The Law of Non–Compete Agreements

#### i.

There are at least four valid and conflicting concerns at issue in the law of non-compete agreements.[2] First, the employer needs to be able to engage a highly trained workforce to be competitive and profitable, without fear that the employee will use the employer's business secrets against it or steal the employer's customers after leaving employment.[3] *See West*

1. 15 U.S.C. sections 1 & 2

2. The term "non-compete agreement" as used herein is meant to include all restrictive covenants entered into between an employer and

an employee restricting the post-employment activities of the employee.

3. Generally non-compete agreements are focused upon post-employment activities. An

*Group Broadcasting, Ltd. v. Bell*, 942 S.W.2d 934, 937 (Mo.App.1997). Second, the employee must be mobile in order to provide for his or her family and to advance his or her career in an ever-changing marketplace. This mobility is dependent upon the ability of the employee to take his or her increasing skills and put them to work from one employer to the next. *See id.* Third, the law favors the freedom of parties to value their respective interests in negotiated contracts. *Willman v. Beheler*, 499 S.W.2d 770, 777 (Mo. 1973). And fourth, contracts in restraint of trade are unlawful. *See* section 416.031.[4]

■ Missouri courts balance these concerns by enforcing non-compete agreements in certain limited circumstances.[5] Non-compete agreements are typically enforceable so long as they are reasonable. In practical terms, a non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer. *American Pamcor, Inc., v. Klote*, 438 S.W.2d 287, 290 (Mo.App.1969). Non-compete agreements are enforceable to the extent they can be narrowly tailored geographically and temporally. In addition, such restrictions are not enforceable to protect an employer from mere competition by a former employee, but only to the extent that the

restrictions protect the employer's trade secrets or customer contacts.[6] *Osage Glass v. Donovan*, 693 S.W.2d 71, 73–5 (Mo. banc 1985); *Schmersahl, Treloar & Co., P.C. v. McHugh*, 28 S.W.3d 345, 349 (Mo.App.2000) (citing *Continental Research Corp. v. Scholz*, 595 S.W.2d 396, 400 (Mo.App.1980)). Missouri law in this regard follows the "modern rule," which Lord Atkinson summarized in *Herbert Morris, Ltd. v. Saxelby*, as follows:

He (employer) is undoubtedly entitled to have his interest in his trade secrets protected, such as secret processes of manufacture which may be of vast value. And that protection may be secured by restraining the employee from divulging these secrets or putting them to his own use. He is also entitled not to have his old customers by solicitation or such other means enticed away from him. But freedom from all competition per se apart from both these things, however lucrative it might be to him, he is not to be protected against. He must be prepared to encounter that even at the hands of a former employee.

[1916] 1 A.C. 688, 702.

**ii.**

■ Missouri courts have found the following factors should be considered in

---

employee has a duty of loyalty to his or her employer during employment. *Scanwell Freight Express STL., Inc., v. Chan*, 162 S.W.3d 477 , 479 (Mo. banc 2005); *National Rejectors Inc. v. Trieman*, 409 S.W.2d 1, 41 (Mo. banc 1966); Restatement (Second) Agency, section 387 (1958).

4. All state statutory references are to RSMo 2000.

5. For a comprehensive discussion of the issues surrounding the use of non-compete agreements, *see* William M. Corrigan Jr. & Michael B. Kass, *Non–Compete Agreements and Unfair Competition—An Updated Overview*, 62 J. Mo. Bar 81–90 (2006).

6. Section 431.202, enacted in July 2001, deals with the ability of an employer to protect its at-will workforce through non-compete agreements. Specifically, section 431.202.1(3) provides: "A reasonable covenant in writing promising not to solicit, recruit, hire or otherwise interfere with the employment of one or more employees shall be enforceable and not a restraint of trade pursuant to subsection 1 of section 416.031 if: between an employer and one or more employees seeking on the part of the employer to protect: (a) Confidential or trade secret business information; or (b) Customer or supplier relationships, goodwill or loyalty, which shall be deemed to be among the protectable interests of the employer."

determining whether given information is a trade secret:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 400–01 (Mo.App.1980) (*citing National Rejectors Inc. v. Trieman,* 409 S.W.2d 1, 18–9 (Mo. banc 1966)). The burden of proof rests upon an employer to substantiate its asserted interest in its trade secrets. *Mo–Kan Central Recovery Co. v. Hedenkamp,* 671 S.W.2d 396, 400 (Mo.App.1984). Evidence of purported "trade secrets" must be more than general assertions, but must be sufficiently specific to allow a determination by the court. *Id., Carboline Co. v. Jarboe,* 454 S.W.2d 540, 549 (Mo.1970).

### iii.

■ "Customer contacts" has been defined as "essentially the influence an employee acquires over his employer's customers through personal contact." *Schmersahl,* 28 S.W.3d at 349. The quality, frequency, and duration of an employee's exposure to an employer's customers are crucial in determining the covenant's reasonableness. *Washington County Memorial Hospital v. Sidebottom,* 7 S.W.3d 542, 545 (Mo.App.1999). The purpose of a non-compete agreement is "to keep the covenanting employee out of a situation in which he might be able to make use of contacts with customers to his former employer's disadvantage." *Osage Glass,* 693 S.W.2d at 75.

### iv.

■ Enforcing non-compete agreements involves a delicate balance of practical business considerations. While the former employee is free to compete, the former employer is entitled to utilize non-compete agreements to protect itself from unfair competition by misuse of its trade secrets or misuse of the employee's customers contacts developed at its expense. "Protection of the employer, not punishment of the employee, is the essence of the law." *Superior Gearbox Co., v. Edwards,* 869 S.W.2d 239, 247 (Mo.App.1993).

Certainly restrictions preventing disclosure of confidential information and restrictions on the solicitation of existing customers serve to protect trade secrets and customer contacts. However, several cases appear to go beyond protecting actual customer contacts and enforce agreements prohibiting *any* competition within the geographic and temporal limitations. *See Osage Glass,* 693 S.W.2d at 75; *Sidebottom,* 7 S.W.3d at 546; *Ballesteros v. Johnson,* 812 S.W.2d 217, 223 (Mo.App. 1991); *Safety–Kleen Systems, Inc. v. Hennkens,* 301 F.3d 931, 935–36 (8th Cir. 2002).

It could be argued that preventing a former employee from seeking *new* customers in competition with his or her former employer goes beyond protecting the employer's interest and is overly restrictive. *See* Harlan M. Blake, *Employee Agreements not to Compete,* 73 Harv. L.Rev. 625, 675–84 (1960) (discussing the scope of restraints on competition). However, in many situations it may be difficult to distinguish between competition for new or existing customers. *See Osage Glass,* 693 S.W.2d at 75. That issue is not reached in this case, as the parties have not raised any issue as to the breadth of the restrictions and Copeland and Helms did in fact assist Integrity in competing for

Oxford's existing customers. A situation where a non-compete agreement is included in the sale of an ongoing business that might support additional considerations is also not reached.

## B. Standard of Review

 The standard of review for a bench-tried case is well-established in Missouri. An appellate court must sustain the decree or judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

## C. Copeland's and Helms' Points of Error

### i.

 Copeland and Helms challenge in their third point the trial court's decision that the declaratory judgment counts of their counterclaims, which assert that the non-compete agreements were unenforceable as a matter of public policy, were barred by res judicata. This point is addressed as a preliminary matter. Res judicata prevents a party from relitigating facts or questions that have been settled by judgment on the merits in a previous action. *Clements v. Pittman*, 765 S.W.2d 589, 591 (Mo. banc 1989).

In the first count of their federal court action, Copeland and Helms sought a declaratory judgment revoking Oxford's tax exempt status and declaring that the non-compete agreements were unenforceable as a matter of public policy because Oxford is a not-for-profit and tax-exempt corporation.[7] In the second count of their federal court claim, Copeland and Helms sought damages under the Sherman Act. The fed-

eral court clearly dismissed both counts for lack of standing.

As to the revocation of Oxford's tax exempt status, the federal court order specifically states, "Count I of the Amended Complaint will be dismissed on the grounds that plaintiffs lacked standing to challenge the tax exempt status of Oxford." As to the claims under the Sherman Act, the federal court order specifically states, "[P]laintiffs do not have standing to assert the Sherman Act claims in Count II." Although the federal court goes on to explain that the Sherman Act claims also could be dismissed for failure to state a claim, this explanation is dicta. The federal court order acknowledges that the analysis of the "failure to state a claim" argument will be cursory "[b]ecause the court [found] dismissal of Count II warranted by reason of the plaintiffs' lack of standing."

 Standing is a jurisdictional matter antecedent to the right to relief. *Farmer v. Kinder*, 89 S.W.3d 447, 451 (Mo. banc 2002). If a party lacks standing, the court must dismiss the case because it does not have jurisdiction of the substantive issues presented. *Id.* Because standing is jurisdictional in nature, a dismissal for lack of standing is not "on the merits" for res judicata purposes. The trial court erred in finding that the declaratory judgment counts of Copeland's and Helms' counterclaims were barred by res judicata.

### ii.

Copeland and Helms assert that the trial court erred in finding that the non-compete agreements were enforceable because they are unlawful restraints on trade under section 416.031 and because Oxford had no protectable interest in trade secrets or customer contacts.

---

7. Copeland and Helms assert similar public policy arguments as both a counterclaim and as a defense to Oxford's claims. The merits of that argument are addressed below in section 3.C. iii.

■ Non-compete agreements are considered contracts in restraint of trade. *Sturgis Equip. Co., Inc. v. Falcon Indust. Sales Co.*, 930 S.W.2d 14, 16 (Mo.App. 1996); *House of Tools & Engineering Inc. v. Price*, 504 S.W.2d 157, 159 (Mo.App. 1973). However, as discussed previously, Missouri courts have carved out narrow exceptions for trade secrets and customer contacts. *Schmersahl*, 28 S.W.3d at 349; *West Group*, 942 S.W.2d at 937. Although non-compete agreements must be strictly construed, they are valid for limited purposes.

■ At trial, there was some evidence that Copeland and Helms had access to confidential or proprietary information in their capacities as Oxford managers. Oxford's owner, Mr. Goforth, offered testimony that Oxford had a unique system of management and supervision that other businesses in the home health marketplace did not possess. However, Mr. Goforth's testimony did not offer any indication of efforts Oxford had undertaken to keep the information secret, how exactly the information was valuable to Oxford or could be valuable to a competitor, the amount of resources Oxford devoted to developing the system of management and supervision, or anything specific enough to allow the court to determine how easily the information could be properly acquired or duplicated by others. *See Continental Research*, 595 S.W.2d at 400–01. While this type of information may or may not have been subject to trade secret protection, Mr. Goforth's testimony simply was not sufficient evidence to establish that Oxford had trade secrets entitled to protection under a non-compete agreement. *See Mo–Kan Central Recovery*, 671 S.W.2d at 400; *Carboline Co.*, 454 S.W.2d at 549.

■ Oxford did, however, establish a protectable interest in its patient base. In a healthcare context, patients are a protectable interest just as customers are protectable in a business context. *Sidebottom*, 7 S.W.3d at 545. At trial, both Copeland and Helms conceded that in the home health industry a provider has an expectation of continued service to an individual patient until that patient no longer qualifies for services or dies. Copeland and Helms also admitted that in the home health industry, when an individual in-home nurse leaves one employer for another, patients will typically request that their services be transferred to the nurse's new employer.

Although Copeland and Helms both held managerial or supervisory positions at Oxford and did not personally have influence over Oxford's patients, they were in the position to exert significant influence over the employees they supervised. Copeland had been employed with Oxford for over twenty years, many of those years in a managerial position. Helms' tenure was shorter, but she was the in-home nurse supervisor. All in-home nurses reported to her. Copeland and Helms also admitted that they had access to the salary information of the employees in the Joplin, Missouri, office. Copeland and Helms had relationships with the employees, knew the salary structure, and were in a position to use this knowledge and influence to recruit Oxford's employees to raid Oxford's patients.

There was sufficient evidence for the trial court to find that Oxford had a protectable interest in its patient base. The non-compete agreements signed by Copeland and Helms were valid and enforceable.[8]

8. Copeland and Helms do not assert that a geographic limitation of 100 miles or a temporal limitation of two years are unreasonable.

### iii.

Copeland and Helms also argue that the non-compete agreements are not enforceable as a matter of public policy because Oxford is a not-for-profit corporation and is not entitled to "restrain trade in the conduct of charitable activities."

■ The corporate powers of not-for-profit corporations and for-profit corporations are identical. *City of St. Louis v. Institute of Medical Education and Research*, 786 S.W.2d 885, 887 (Mo.App.1990), *see* chapter 355. Copeland and Helms seem to misperceive the driving principle behind not-for-profit status. The simple fact that a corporation is organized for benevolent purposes does not indicate that such corporation does not have protectable business interests.

The distinguishing characteristic between for-profit and not-for-profit corporations is not whether each seeks to operate efficiently, generate revenue, and produce earnings, but rather what each entity does with such earnings. Earnings of not-for-profit corporations are used to support the charitable purpose of the corporation or are reinvested into the company to ensure future operations. In contrast, earnings of for-profit corporations are distributed to owners or shareholders.

■ Not-for-profit corporations are entitled to protect themselves from unfair competition just as for-profit corporations can. Furthermore, Missouri courts have enforced non-compete agreements on behalf of not-for-profit corporations. *See Sidebottom*, 7 S.W.3d 542. Oxford's not-for-profit status has no effect on its ability to protect itself from unfair competition by way of non-compete agreements.

### iv.

■ Finally, Copeland and Helms assert that the trial court erred in denying count I of their counterclaims for tortious interference with a business expectancy.

A claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct. *Community Title Co. v. Roosevelt Federal Savings and Loan Association*, 796 S.W.2d 369, 372 (Mo. banc 1990). Under Missouri law, no liability arises for interfering with a contract or business expectancy if the action complained of was an act that the defendant had a definite legal right to do without any qualification. *Id.* A company is justified in attempting to enforce its rights under a non-compete agreement so long as it has a reasonable, good faith belief in the validity of the agreement. *Luketich v. Goedecke, Wood & Co. Inc.*, 835 S.W.2d 504, 508 (Mo.App.1992). Oxford was justified in acting to enforce the terms of the agreements.

### D. Oxford's Point of Error

Oxford cross-appeals claiming that the trial court erred in not awarding Oxford damages against Copeland for her breach of the non-compete agreement. The trial court denied Oxford's damages claim as speculative, stating "[t]here was no evidence that any specific employee or patient of [Oxford] switched employers or providers due to the efforts of [Copeland and Helms]."

Oxford's point on cross-appeal centers solely on Copeland's decision to allow Integrity to use her certificate of provider certification training to obtain its provider license. Oxford asserts that because a certificate of provider certification training is required before a provider can be licensed, Integrity could not have entered

the home health market when it did without Copeland's certificate. Oxford claims that Copeland is liable for damages caused by the loss of any patients or employees to Integrity during the period of time that Integrity relied upon Copeland's certificate from February 4, 2000, to July 3, 2000.

### i. Lost Patients

■ Although the use of Copeland's certificate is not, in a strict sense, a customer contact, it was an essential element to Integrity's ability to enter the market and to compete with Oxford for its patients. The certificate was particular to Copeland and was obtained while working for Oxford. Use of Copeland's certificate allowed Integrity to enter the market and to compete with Oxford sooner than would have been possible otherwise. Use of the certificate was combined with Integrity's recruitment of Oxford employees to obtain Oxford patients. Any patients obtained by Integrity from Oxford during this period necessarily and directly resulted from the use of the certificate. In this situation, by allowing Integrity to use the certificate, Copeland unfairly competed with Oxford and breached the non-compete agreement.

Oxford is entitled to damages for the loss of any patient who left Oxford in favor of Integrity during the time that Integrity relied on Copeland's certificate, assuming such damages are proven. The trial court's judgment on this issue is reversed, and the case is remanded. On remand, the court can determine the damages incurred between February 4, 2000, and July 3, 2000, relative to any patients Oxford lost to Integrity.

### ii. Lost Employees

While it is true that Integrity could not have competed for Oxford's patients without Copeland's certificate, the same is not true as to the hiring of Oxford's employees. Integrity was free to hire any of Oxford's employees as it was forming its business and taking steps towards entering the home health market irrespective of Copeland's employment or her certificate of provider certification training. As such, to be entitled to damages, Oxford must prove that individual employees left Oxford and joined Integrity as a result of Copeland's efforts. The trial judge specifically held that Oxford failed to make such a showing.

At trial, Oxford's vice-president of support services, Richard McGee, testified about its damages. McGee presented three spreadsheets purportedly summarizing the employees lost to Integrity during the time that Integrity relied on Copeland's certificate of provider certification training and the associated costs of recruiting and training those employees.

When questioned as to the source of the information in the spreadsheets, McGee acknowledged that it was not necessarily all based on first-hand knowledge. McGee conceded that Oxford "put two and two together" when clients that had been serviced by a resigning employee called and requested that their services be switched to Integrity. McGee testified that the information in the spreadsheets was all noted somewhere in Oxford's business records, but conceded that he did not necessarily get all of the information contained in the spreadsheets from such business records. Copeland's counsel objected to the introduction of the spreadsheets on the basis that the exhibits lacked foundation, were based upon hearsay, and called for speculation and conjecture. The judge admitted the exhibits, but acknowledged that he would consider the objections in assessing the weight of the evidence.

■ "A number of foundational requirements must be met before a document may be received into evidence, including relevancy, authentication, the best evidence rule, and hearsay." *Ozark Ap-*

*praisal Service, Inc., v. Neale,* 67 S.W.3d 759, 766 (Mo.App.2002). The purpose of the hearsay rule is to ensure documents admitted into evidence are trustworthy. *Id.* "The determination of whether a sufficient foundation was laid for admission of the evidence is within the sound discretion of the trial court." *In the Estate of West v. Moffatt,* 32 S.W.3d 648, 653 (Mo.App. 2000).

In Missouri, the business records exception to the hearsay rule is established by statute. Section 490.680 states:

> A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources or information, method and time of preparation were such as to justify its admission.

A summary of voluminous records is admissible in evidence provided that the competency of the underlying records is first established and such records are made available to the opposite party for cross-examination purposes. *Ozark Appraisal,* 67 S.W.3d at 766.

Oxford's exhibits illustrating employees lost to Integrity during the time it relied on Copeland's certificate were purportedly summaries of data compiled from various business records. There is no indication in the record that any of the underlying business records that Oxford's exhibits were based upon were introduced into evidence or made available to Copeland. By ultimately holding that the damages claim was speculative, the trial judge determined either that the exhibits were not properly before the court as hearsay or were simply not convincing. The trial court's determination that the damages as to lost employees were speculative was not against the weight of the evidence. *See Murphy,* 536 S.W.2d at 32. Furthermore, the trier of facts has the right to disbelieve evidence, even when it is not contradicted. *See State ex rel. Missouri Gas & Electric Service Company v. Trimble,* 307 Mo. 536, 271 S.W. 43, 47 (1925).

## IV. Conclusion

The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded.

All concur.