**PAYROLL ADVANCE, INC., Appellant,**

v.

**Barbara YATES, Respondent.**

No. SD 29040.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 17, 2008.

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■

■■■■■■■■■■■■■

■■■■■■■■■■■■■

■■■■■■■■■■■■■

■■■■■■■■■■■■■

■■■■■■■

■■■■■■■■■■■■■

■■■■■■■■■■■

■■■■■■■

■■■■■■■■■■■■■

■■■■■■■

■■■■■■■■■■■■■

■■■■■■

■■■■■■■■■■■■■

■■■■■■■■■■

■■■■■■■■■■■■■■

■■■■■■■■■■■■■

■■■■■■■

■■■■■■■■■■■■■■

■■■■■■■■■■■■■

■■■■■■■■

■■■■■■■■■■■■■■

■■■■■■■■■■■■■■

Jason M. Scherer, Crow, Reynolds, Shetley & McVey, LLP, Kennett, for Appellant.

Shannon Wright Morgan, Pelts, McMullan & Edington, LLP, Kennett, for Respondent.

ROBERT S. BARNEY, Judge.

Payroll Advance, Inc. ("Appellant") appeals from the judgment of the trial court entered in favor of Barbara Yates ("Respondent") on Appellant's petition for injunctive relief and breach of contract of an "Employment Agreement" ("the Employment Agreement") which contains a cove-

nant not to compete. After a bench trial, the trial court found the Employment Agreement and its non-compete covenant signed by the parties was not valid in that it was "unreasonable under the facts and circumstances of the particular industry, agreement, and geographic location here involved." Appellant asserts two points of trial court error. In its first point, Appellant maintains the trial court erred in denying its petition for permanent injunction in that the trial court "erroneously applied the law pertaining to the reasonableness and enforceability of covenants not [to] compete ..." and "the covenant not to compete should have been upheld and a permanent injunction issued." In its second point, Appellant maintains the trial court erred in denying its petition because the trial court erroneously applied the law in failing to modify the covenant not to compete to a geographic scope it found to be reasonable. We affirm the judgment of the trial court.

The standard of review for a bench-tried case is well-established in Missouri. An appellate court must sustain the decree or judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

*Healthcare Servs. of the Ozarks, Inc. v. Copeland,* 198 S.W.3d 604, 612 (Mo. banc 2006). This Court reviews the evidence, along with all reasonable inferences, in the light most favorable to the trial court's judgment and disregards all contrary evidence and inferences. *Emerald Pointe, L.L.C. v. Jonak,* 202 S.W.3d 652, 658 (Mo. App.2006). As the trier of fact, the trial court determines the credibility of witnesses and is free to believe or disbelieve all or part of the witnesses' testimony. *Id.*

■ Viewing the evidence in the light most favorable to the trial court's judgment, *id.,* the record reveals that Appellant, a foreign corporation, is licensed to transact business in the State of Missouri and has numerous locations throughout the state, including a branch located in Kennett, Missouri.[1] It is customary for each of Appellant's branch offices to employ a sole employee at each branch and that sole employee is typically referred to as the manager of that particular branch. In June of 1998, Respondent was hired as the manager of the branch office in Kennett. On November 19, 1999, as a condition of her continued employment, Appellant presented Respondent with the Employment Agreement which included, *inter alia,* a provision entitled "NON–COMPETE" ("the covenant not to compete"). This provision set out:

[Respondent] agrees not to compete with [Appellant] as owner, manager, partner, stockholder, or employee in any business that is in competition with [Appellant] and within a 50 mile radius of [Appellant's] business for a period of two (2) years after termination of employment or [Respondent] quits or [Respondent] leaves employment of [Appellant].

Respondent was employed with Appellant from June of 1998 through November 8, 2007, when Respondent was apparently fired for cause.

Approximately thirty-two days after being terminated by Appellant, Respondent

---

1. Appellant is "a payday loan company. [It] gives loans to clients out in the community." As best we discern the record, loans are made for short periods of time at high rates of interest. Appellant's manager testified that a payday loan company such as Appellant's is not like a bank because banks "normally [do not do] short-term loans." She also distinguished Appellant's entity from a title loan company or a debt consolidation concern.

became employed with Check Please, one of the approximately fourteen other payday loan establishments in the area. At Check Please, Respondent performed basically the same duties such as office management and customer care as she had when employed with Appellant.

On February 7, 2008, Appellant filed its "First Amended Petition for Injunctive Relief and Breach of Contract." In this petition, Appellant brought Count I for injunctive relief to prevent Respondent from soliciting its clients for her new employer, and to stop her from using client information she purportedly obtained from her time with Appellant. Count II of the petition was for damages for breach of contract for violation of the covenant not to compete together with attorney fees and costs.

The matter was tried to the court on February 7, 2008. At trial, Virginia Holloway ("Ms. Holloway"), Appellant's Chief Executive Officer, testified that she "maintain[s] the books" and "basically run[s] the company," but that the individual branch managers dealt with the clients and actually issued the loans.[2] She related that branch managers, such as Respondent, directly contacted each customer; personally saw customers each time they were in the office; and developed a rapport and relationship with each client. Ms. Holloway also related that Appellant maintained client lists which detailed personal client information and that a large portion of their business was based on repeat customers. She further testified that Respondent would have had access to these client lists as part of her day-to-day job, but that she had no knowledge that Respondent had either taken client lists with her when she was fired or contacted any of Appellant's clients since her termination. She

related she personally fired Respondent and when Respondent left the office on that date she did not take anything with her.

Additionally, Ms. Holloway testified that since Respondent left Appellant's employ there had been a downturn in the amount of loans occurring in the Kennett office such that the number of clients has decreased from 141 to 99 and the accounts receivable has fallen from $74,254.53 to $46,927.78; however, she stated that the only evidence she had that the downturn in business was related to Respondent's departure was the "lack of the return customers that [Appellant has] had for a long time . . . ." She did, however, admit it was not uncommon for clients to utilize several agencies and have more than one loan out at a time.

Respondent testified she knew she had signed the Employment Agreement which contained the covenant not to compete, but she thought the document was "vague," because it stated she could not be employed in "any business that is in competition with [Appellant] and within a 50–mile radius . . . [i]t really doesn't state payday loans, it says *any business that is in competition.*" (Emphasis added.) She stated that the covenant not to compete would require her to take a position out of state or at least a long way from her present home. She felt such a requirement was "absolutely not" reasonable based on the type of business she had experience in and the opportunities in her small community. She admitted that she was reminded of the covenant not to compete when she was terminated by Appellant and that Appellant's representative told her she "ha[d] been warned" they would pursue the terms of the covenant not to compete if she went

---

**2.** Ms. Holloway testified that Appellant has seventeen branch locations in Missouri, including the office in Kennett, as well as branch offices in Arkansas and other states.

to work for a competitor. After being fired, she related she was turned down for unemployment benefits and began immediately looking for new employment. She stated after several weeks of looking for a job she was contacted by the owner of Check Please, who was also a former employee of Appellant. He offered her a job and she accepted the position. She stated she was the only person in her family working and she would work wherever she could get a job regardless of any ramifications of the covenant not to compete. She admitted that Check Please was in competition with Appellant, but she stated that she took her new position because she had been unable to find another job.

Respondent also maintained that any decline in business which followed her departure from Appellant was not related to her new employment at a competing business as asserted by Ms. Holloway. She related that the payday loan business is "seasonal" with January and February being slow months. She stated that around Christmas time people get bonuses and often don't need loans or, if they do need loans, they are busy paying off their loans. Additionally, she stated that her job with Appellant was "highly clerical" in nature and basically consisted of helping clients fill out the loan applications. She stated she did not feel like she developed "really personal relationships" with any of Appellant's clients other than small talk during the processing of their loans and she never had "contact outside the business" with any of Appellant's clients. She felt any relationships she had with clients were purely "business relationships."

Respondent also asserted she did not take any client lists with her when she was terminated from Appellant and she did not openly contact any clients after her departure. She stated her present employer shares numerous clients with Appellant, but she "didn't call anybody or attempt to call anybody" in an effort to take business from Appellant. She related that clients are limited to having one loan at each payday loan agency and so many clients "go to various payday loan places." Further, she stated she had lived in Kennett for a significant period of time and had numerous community contacts other than those she met while employed with Appellant.

On February 14, 2008, the trial court entered its judgment which found "[n]o evidence exists that, following [Appellant's] termination of [Respondent's] ten year period of employment, [Respondent] removed any customer list or other documents from [Appellant's] place of business [or] . . . made any personal or other contact with any previous or present customer of [Appellant's] business or intends to do so." The trial court further determined that that if the covenant not to compete was enforced as requested, Respondent

> will be prohibited from engaging in employment with any payday loan business in at least 126 cities situated in Missouri, Arkansas and Tennessee ( [p]resumably [Respondent] also would be prohibited from such employment within a 50–mile radius of [Appellant's] 17 other locations scattered throughout the State of Missouri. Further, [Respondent] arguably also would be prohibited from employment at a bank, savings and loan company, credit union, pawn shop or title-loan company, credit union, pawn shop or title-loan company within such geographical areas . . . .)

Accordingly, in its discretion, the trial court found "the above result would be unreasonable under the facts and circumstances of the particular industry, agreement, and geographic location here involved." The trial court then ruled in favor of Respondent and against Appel-

**434**

lant. The trial court also denied Respondent's request for attorney's fees and costs. This appeal followed.

■ In its first point relied on, Appellant maintains the trial court erred in denying its "petition for permanent injunction" in that the trial court "erroneously applied the law pertaining to the reasonableness and enforceability of covenants not [to] compete...." Specifically, Appellant asserts the covenant not to compete "was breached by Respondent ... and [Appellant] suffered the potential of irreparable harm and, therefore, the covenant not to compete should have been upheld and a permanent injunction issued."

■ "Generally, because covenants not to compete are considered to be restraints on trade, they are presumptively void and are enforceable only to the extent that they are demonstratively reasonable." *Easy Returns Midwest, Inc. v. Schultz,* 964 S.W.2d 450, 453 (Mo.App.1998); *see Armstrong v. Cape Girardeau Physician Assoc.,* 49 S.W.3d 821, 825 (Mo.App.2001). "Noncompetition agreements are not favored in the law, and the party attempting to enforce a noncompetition agreement has the burden of demonstrating both the necessity to protect the claimant's legitimate interests and that the agreement is reasonable as to time and space." *Healthcare Servs.,* 198 S.W.3d at 609–10.

There are at least four valid and conflicting concerns at issue in the law of non-compete agreements. First, the

employer needs to be able to engage a highly trained workforce to be competitive and profitable, without fear that the employee will use the employer's business secrets against it or steal the employer's customers after leaving employment. Second, the employee must be mobile in order to provide for his or her family and to advance his or her career in an ever-changing marketplace. This mobility is dependent upon the ability of the employee to take his or her increasing skills and put them to work from one employer to the next. Third, the law favors the freedom of parties to value their respective interests in negotiated contracts. And, fourth, contracts in restraint of trade are unlawful.

*Id.* (internal citations omitted). "Missouri courts balance these concerns by enforcing non-compete agreements in certain limited circumstances." *Id.* "Non-compete agreements are typically enforceable so long as they are reasonable. In practical terms, a non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer." *Id.* Furthermore, "[n]on-compete agreements are enforceable to the extent they can be narrowly tailored geographically and temporally." *Id.* Saliently, "such restrictions are not enforceable to protect an employer from mere competition by a former employee, but only to the extent that the restrictions protect the employer's *trade secrets*[3] or *customer contacts.*"[4]

---

3. A trade secret "can be 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' " *Kessler–Heasley Artificial Limb Co. v. Kenney,* 90 S.W.3d 181, 188 (Mo.App.2002) (quoting *National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 18–19 (Mo. banc 1966)). "Evidence of purported 'trade secrets' must be more than general assertions, but must be

sufficiently specific to allow a determination by the court." *Healthcare Servs.,* 198 S.W.3d at 611. "The burden of proof rests upon an employer to substantiate its asserted interest in its trade secrets." *Id.*

4. "A customer is one who repeatedly has business dealings with a particular tradesman or business." *Kessler–Heasley,* 90 S.W.3d at 186. "Before an employer can claim to have a protectable interest in its customer contacts, the employer must have a stock of customers

*Healthcare Servs.*, 198 S.W.3d at 610 (emphasis added). Lastly, it is not "necessary for the employer to show that actual damage has occurred, in order to obtain an injunction. The actual damage might be very hard to determine, and this is one reason for granting equitable relief." *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75 (Mo. banc 1985).

Here, viewing the evidence in a light most favorable to the trial court's holding, *Emerald Pointe*, 202 S.W.3d at 658, it is clear the trial court took umbrage with the covenant's restrictive provisions and geographical limitations on Respondent's ability to find employment.

▮▮▮▮ While Appellant cites this Court to numerous cases where a geographic restriction of 50 miles has been deemed reasonable, the case law clearly requires that such restrictions must be viewed under the specific circumstances of each case. To be valid and enforceable, a covenant not to compete must be reasonable as to time and space, because such clauses limit the exercise and pursuit of an individual's occupation and are in restraint of trade. *Osage Glass*, 693 S.W.2d at 73–4. It has long been held that "[t]emporary and spatially limited restraints on a former employee's ability to compete . . . are enforceable if reasonable under all attending circumstances and if enforcement serves the employer's legitimate interests." *AEE–EMF, Inc. v. Passmore*, 906 S.W.2d 714, 719 (Mo.App.1995). As stated in *R.E.*

*Harrington, Inc. v. Frick*, 428 S.W.2d 945, 950 (Mo.App.1968):

> The question of reasonableness of a restraint is to be determined according to the facts of the particular case and hence requires a thorough consideration of all surrounding circumstances, including the subject matter of the contract, the purpose to be served, the situation of the parties, the extent of the restraint, and the specialization of the business.

*See also Sturgis Equip. Co. v. Falcon Indus. Sales Co.*, 930 S.W.2d 14, 17 (Mo.App. 1996) (holding that courts must examine the circumstances surrounding each covenant not to compete "including its subject matter, the purpose it serves, the situation of the parties, the limits of the restraint, the specialization of the business involved, the consideration supporting the restraint, the threatened danger to the employer absent the restriction, and the economic hardship imposed on the employee"). In determining reasonableness, the standard is whether the geographic scope of the restrictive covenant is " 'no greater than fairly required for protection.' " *Systematic Bus. Servs., Inc. v. Bratten*, 162 S.W.3d 41, 50 (Mo.App.2005) (quoting *Schott v. Beussink*, 950 S.W.2d 621 (Mo. App.1997)). Protection of a former employer's legitimate business interests and "not punishment of the former employee is the essence of the law." *Healthcare Servs.*, 198 S.W.3d at 611. "The burden of demonstrating the covenant's validity is on the party seeking to enforce it." *Arm-*

---

who regularly deal with the employer." *Id.* " '[T]he quality, frequency and duration of employee's exposure to the customers is of crucial importance in determining the reasonableness of the restriction.' " *Easy Returns*, 964 S.W.2d at 453 (quoting *Cont'l Research Corp. v. Scholz*, 595 S.W.2d 396, 400 (Mo. App.1980)). However, " '[t]o be protected a customer list must be more than a listing of firms or individuals which could be compiled

from directories or other generally available sources.' " *Kessler–Heasley*, 90 S.W.3d at 188 (quoting *Empire Gas Corp. v. Graham*, 654 S.W.2d 329, 331 (Mo.App.1983)). "Only when it represents a selective accumulation of information based on past selling experience, or when considerable time and effort have gone into compiling it, will appropriation and use in competition by the former employee be enjoined." *Id.*

*strong,* 49 S.W.3d at 825; *see also AEE–EMF,* 906 S.W.2d at 719.

Here, the covenant not to compete grandly declares that Respondent cannot "compete with [Appellant] as owner, manager, partner, stockholder, or employee *in any business* that is in competition with [Appellant] and within a 50 mile radius of [Appellant's] business. . . ." (Emphasis added.) There was evidence from Appellant's representative at trial that Appellant has seventeen branch offices in Missouri and still other locations in Arkansas. If this Court interprets the plain meaning of the covenant not compete as written, the covenant not to compete would prevent Respondent not only from working at a competing business within 50 miles of the branch office in Kennett, Missouri, but Respondent would also be barred from working in a competing business within 50 miles of *any* of Appellant's branch offices. Under this interpretation, Respondent would be greatly limited in the geographic area she could work.

Additionally, the covenant not to compete bars Respondent from working at "any business that is in competition with [Appellant]." Yet, it fails to set out with precision what is to be considered a competing business and certainly does not specify that it only applies to other payday loan businesses. In that Appellant is in the business of making loans, it could be inferred that in addition to barring Respondent's employment at a different payday loan establishment the covenant not to compete also bars her from being employed anywhere loans are made including banks, credit unions, savings and loan organizations, title-loan companies, pawn shops, and other financial organizations. Such a restraint on the geographic scope of Respondent's employment and upon her type of employment is unduly burdensome

and unreasonable. *See Healthcare Servs.,* 198 S.W.3d at 609–10.

Further, as previously related, we not only look to the actual terms of the covenant not to compete, but to the impact on Respondent herself. *See AEE–EMF,* 906 S.W.2d at 719; *R.E. Harrington,* 428 S.W.2d at 950. Here, Respondent testified she was employed with Appellant for a period of nine years and that, although she had experience in other areas, she was unable to find a job in Kennett in a business other than another payday loan establishment. She related she was the only person able to work in her family and when approached by Check Please with a comparable position to that which she previously had, she took the job because she needed the income. There is evidence supporting the trial court's determination that requiring Respondent to comply with the geographic limitation and the type of employment she was permitted under the covenant not to compete would greatly restrict her ability to provide for her family and clearly be a restraint on her future employment. Having considered "the facts of the particular case and . . . all surrounding circumstances . . .," *R.E. Harrington,* 428 S.W.2d at 950, this Court finds no error in the trial court's denial of Appellant's request for a permanent injunction per the terms of the covenant not to compete. Point One lacks merit.

Appellant's second point relied on asserts the trial court erred in denying its petition because

[t]he trial court erroneously applied the law in failing to modify the covenant not to compete to a geographic scope it found to be reasonable in that the court found the geographic scope to be unreasonable for the payday loan industry but failed to modify the covenant not to compete to reflect a geographic scope that would be reasonable and enforceable.

We recognize that "[t]he ordinary rules of contractual construction and enforcement are not necessarily applicable to non-compete agreements." *AEE–EMF*, 906 S.W.2d at 719. Further, in the past numerous courts have limited and affirmed modifications by trial courts of covenants not to compete where the restrictions set out in the covenants were broader than necessary. *See Mid–States Paint & Chemical Co. v. Herr*, 746 S.W.2d 613, 616 (Mo.App.1988); *Orchard Container Corp. v. Orchard*, 601 S.W.2d 299, 303 (Mo.App. 1980); *R.E. Harrington*, 428 S.W.2d at 950. This Court "recognize[s] that an unreasonable restriction against competition in a contract may be modified and enforced to the extent that it is reasonable, regardless of the covenant's form of wording." *Mid–States Paint*, 746 S.W.2d at 616. We are not convinced, however, that a trial court is compelled to take action to modify an agreement it finds broader than necessary. "The issuance and terms of an injunction rest 'largely in the sound discretion of the trial court, which is vested with a broad discretionary power to shape and fashion the relief it grants to fit particular facts, circumstances and equities of the case before it.'" *Id.* (quoting *May Dept. Stores Co. v. County of St. Louis*, 607 S.W.2d 857, 870 (Mo.App.1980)). This is particularly the case where, as here, a party has not raised the issue before the trial court.

Having reviewed the record in this matter, it appears the record is devoid of a request by Appellant for modification of the covenant not to compete either in its pleadings, at trial, or in its motion for new trial before the trial court. It is settled law that "'appellate courts are merely courts of review for trial court errors, and there can be no review of matter which has not been presented to or expressly decided by the trial court.'" *Roberson v. Weston*, 255 S.W.3d 15, 19 (Mo.App.2008) (quoting *Robbins v. Robbins*, 328 S.W.2d 552, 555 (Mo.1959)).

Appellant urges in its reply brief that this issue was, indeed, preserved for appeal by the request in its petition for "such other and further relief as the Court may deem just and proper" and in support of this proposition cites the Court to *Jerry Bennett Masonry, Inc. v. Crossland Const. Co.*, 171 S.W.3d 81, 91 (Mo.App.2005). In *Jerry Bennett Masonry*, a prevailing subcontractor did not expressly request statutory interest pursuant to the provisions of section 408.020, RSMo 2000, but did pray in its petition "'for such other and further relief as the Court may deem just and proper.'" *Id.* This Court observed that "'an express allegation *seeking prejudgment interest* is not a prerequisite to an award of such interest'" and found that the subcontractor's claim and prayer satisfied the statutory requirement. *Id.* (quoting *Dierker Assocs., D.C., P.C. v. Gillis*, 859 S.W.2d 737, 746 (Mo.App.1993)) (emphasis added).[5] Here, the relief Appellant requests does not pertain to an award of prejudgment interest as in *Jerry Bennett Masonry*, 171 S.W.3d at 91, or *Dierker*, 859 S.W.2d at 746. In the present matter, the issue of modification of the covenant not to compete was simply not before the trial court. "'An issue that was never

---

**5.** The court in *Dierker*, 859 S.W.2d at 746, cited to *Addison v. Jester*, 758 S.W.2d 454 (Mo.App.1988), for the proposition that "an express allegation seeking prejudgment interest is not a prerequisite to an award of such interest." This is because as *Addison*, 758 S.W.2d at 460, explained, "[t]he allowance of prejudgment interest is not, however, dependent on an express petition allegation seeking that relief." "It is not necessary for evidence to be presented or for a jury to be instructed on the subject where prejudgment interest is only a matter of mathematical computation." *Id.*

presented to or decided by the trial court is not preserved for appellate review.'" *Roberson*, 255 S.W.3d at 19 (quoting *Van-Booven v. Smull*, 938 S.W.2d 324, 330 (Mo. App.1997)). Point Two is denied.

The judgment of the trial court is affirmed.

BATES, J. and SCOTT, P.J., concurs.