

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| SIGMA-ALDRICH CORPORATION, | ) | No. ED100575 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Mary Elizabeth Ott |
| OMAR VIKIN, | ) | |
| | ) | |
| Respondent. | ) | FILED:  October 14, 2014 |

Sigma-Aldrich Corp. ("Sigma") appeals from the trial court's judgment in a court-tried case, denying its request for injunctive relief and ruling that a non-compete provision in an agreement ("Agreement") between Sigma and the defendant-respondent, Omar Vikin ("Defendant"), was unenforceable with regard to Defendant's new position at Alfa Aesar ("Alfa"), a wholly owned subsidiary of the Johnson-Matthey Catalog Co. Inc.  We affirm.

## I.  Background

Due to the sensitive nature of the subject matter involved, our recitation of the facts here is limited.

Sigma first hired Defendant in 2006 from Sigma's competitor, VWR, whereby Defendant and Sigma agreed that Defendant would not call on the same customers that Defendant had serviced while he was at VWR and would not reveal confidential information.  Although VWR

had a non-compete provision with Defendant, it agreed to allow Defendant work for Sigma. VWR "invented" a web site combined with an aggregation strategy, which focuses on finding the best supplies for products; Defendant knew exactly how it was done.

On February 24, 2006, Defendant signed an Agreement, which included a non-compete provision, as a condition of his employment with Sigma. While at Sigma, Defendant worked in various roles, including a sales position, a member of Sigma's strategic-planning team, expanding Sigma's packaging and shipping, developing Sigma's Science Place Business Plan, aggregation and implementation of Science Place, and upgrading through marketing the "user experience" on Sigma's website.

On July 15, 2013, Defendant announced he was resigning from Sigma to take a position with Alfa as the General Manager of Americas. Alfa does not have a Science Place business model, nor does Defendant's position perform web design. Defendant's job is to "run the operation, the plant, the facilities. There is a sales leader who would go and visit the customers." Defendant was to focus on the supply chain, compliance, and personnel turnover. Alfa's global manager, Julie Butterfield, who worked for Johnson Matthey for 30 years and supervises Defendant's new position which she had also performed, testified as to what the GM's responsibilities included, noting that it was an oversight position. She did not believe the GM position would run afoul of the Agreement's non-compete provisions. The GM position was not a sales position, nor was it involved in digital marketing.

Sigma thereafter filed a petition in St. Louis County Circuit Court to enjoin Defendant from working for Alfa, and Sigma moved for a temporary restraining order. Although the court granted the TRO upon Sigma's execution of a $500,000 bond, it later held a hearing and then denied Sigma's petition for preliminary injunction and dissolved the TRO. Sigma then asked the

court to modify the Agreement and enforce it, and it requested that the court consolidate and convert the order into a final judgment and order with respect to Sigma's application for permanent injunction. Sigma further requested that the court enter an injunction to preserve the status quo pending the appeal of the Order. The court followed another hearing with an order that was "dispositive on [Sigma's] application for permanent injunction" and denied modification and the requested status-quo injunction.

This appeal follows.

## II. Discussion

Sigma raises three points on appeal. In its first point, Sigma alleges the trial court erred in holding the Agreement was unenforceable, in refusing to modify it, and in denying injunctive relief on the ground that it did not contain a geographic or other non-temporal restriction because that holding erroneously declared and applied the law. Sigma contends: (a) the Agreement does contain non-temporal restrictions that prohibit Defendant only from working for businesses that sell products that compete with products about which he "had access to confidential information," and only where Sigma markets such products; (b) the Agreement was reasonable because it was no more restrictive than necessary to protect the legitimate interests of Sigma, which competes globally, and a restrictive covenant is not unenforceable merely because it lacks a geographic restriction; and (c) Sigma is seeking to enforce the Agreement only to enjoin Defendant from working for Alfa in Massachusetts.

Second, Sigma alleges the trial court erred in holding that the Agreement was unenforceable and in denying injunctive relief on the ground that the competition between Sigma and Alfa is "generic, macro-economic, and general," "does not pose a threat to Sigma," and does not rise above "mere competition" to the "level protected by" the Agreement because that

3

holding was not supported by substantial evidence, was against the weight of the evidence, and erroneously declared and applied the law. Sigma argues: (a) the undisputed evidence and the court's findings demonstrate that Sigma and Alfa compete in the research chemicals market and competition is neither one-sided nor subjective; (b) because he possesses Sigma's confidential information, Defendant's role at Alfa involves more than "mere competition" with Sigma, and Missouri law does not recognize the concepts of "generic," "macro-economic," or "general" competition; (c) because Alfa sells products that compete with products about which Defendant has confidential information, the Agreement's protections are triggered, and (d) the Order is based on erroneous and irrelevant findings regarding Sigma and Alfa's respective market shares of the global "chemical industry market."

Third and finally, Sigma contends the trial court erred in holding that the Agreement was unenforceable and in denying injunctive relief on the ground that Sigma had not sustained its burden of proof that Defendant is in possession of Sigma's current confidential or trade secret information, which would present a current threat to Sigma if known to Alfa. Sigma argues the holding was unsupported by substantial evidence, was against the weight of evidence, and erroneously declared and applied the law in that the court expressly found Defendant had access to trade secrets relating to Sigma's current marketing and business planning efforts and that he gained access to confidential information that would be beneficial to Sigma's competitors if disclosed; the evidence overwhelmingly established that such trade secrets and information remained current, and his working at Alfa created the opportunity for him to use the information to Sigma's detriment; and Sigma was not required to show a "direct relationship" between its information and Alfa's "current commercial enterprise."

**A. Standard of Review**

4

A trial court's judgment is reviewed under the standard set forth in Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). Paradise v. Midwest Asphalt Coatings, Inc., 316 S.W.3d 327, 329 (Mo. App. W.D. 2010). We will affirm the judgment of the trial court unless there is no substantial evidence to support the decision, the decision is against the weight of the evidence, or the trial court erroneously declared or applied the law. Murphy, 536 S.W.2d at 32. We will accept all evidence and inferences favorable to the judgment and disregard all contrary evidence. 8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc., 292 S.W.3d 439, 445 (Mo. App. E.D. 2009).

Additionally, an injunction is an action in equity, and the standard of review for a court-tried action in equity is the same as the standard for a judge-tried case. Systematic Bus. Servs., Inc. v. Bratten, 162 S.W.3d 41, 46 (Mo. App. W.D. 2005). A party must have proved that it had no adequate remedy at law and that irreparable harm would have resulted if the injunction was not granted. City of Kansas City v. New York-Kansas Bldg. Assocs., L.P., 96 S.W.3d 846, 855 (Mo. App. W.D. 2002).

## B. Analysis

"The law of non-compete agreements in Missouri seeks to balance the competing concerns between an employer and employee in the workforce." JumboSack Corp. v. Buyck, 407 S.W.3d 51, 55 (Mo. App. E.D. 2013) (quoting Healthcare Servs. of the Ozarks, Inc. v. Copeland, 198 S.W.3d 604, 610 (Mo. banc 2006)). We consider the practical business concerns of the former employee's freedom to compete, versus the former employer's right to utilize non-compete agreements to protect itself from unfair competition by misuse of its trade secrets or misuse of the employee's customers' contacts developed at its expense. Healthcare Servs., 198 S.W.3d at 611. A court will enforce a non-compete only if it is reasonable, meaning "it is no

more restrictive than is necessary to protect the legitimate interest of the employer." Id. at 610. As such, a non-compete agreement must be narrowly tailored geographically and temporally. Id. Restrictive covenants are not enforceable to protect an employer from mere competition by a former employee, but only to the extent that they protect the employer's trade secrets or customer contacts. Id. The employer has the burden to prove the reasonableness of the non-compete agreement. Whelan Sec. Co. v. Kennebrew, 379 S.W.3d 835, 842 (Mo. banc 2012).

*Geographic limitations in non-compete Agreement*

Sigma first argues the Agreement restricts Defendant only from working for companies that sell products that compete with Research products, and only in locations where Sigma "markets or sells" Research products. Sigma contends the Agreement is reasonable in geographic scope even without specifying a geographic territory in which Defendant cannot work because the Agreement is targeting companies who "could exploit Sigma's trade secrets to their competitive advantage" on a global basis.

Missouri courts enforce customer non-solicitation clauses without a geographic limitation when other limitations to the prohibited conduct exist or when the employee had significant contact with a substantial number of the employer's customers. Whelan Sec. Co., 379 S.W.3d at 842. For example, in Mills v. Murray, the court held that, although the restrictive covenant imposed no "spatial" restraint, a time limitation was imposed within which the employee could not "solicit, contract with, or service those for whom he had rendered comparable services during the last year of his employment . . . ." 472 S.W.2d 6, 12 (Mo. App. 1971).

Sigma argues that a similar, even broader provision was enforced under Missouri law in Sigma Chemical Co. v. Harris, wherein the covenant had a product-based restriction but was not limited to locations where Sigma sells or markets those products "because Sigma's need for

6

protection covers the face of the earth." 605 F. Supp. 1253, 1264 (E.D. Mo. 1985), *aff'd in part*, 794 F.2d 371 (8th Cir. 1986). On review, however, the Eighth Circuit Court of Appeals stated that it need not decide whether, under Missouri law, the covenant was unenforceable because of a lack of a geographical restriction. Because the district court only enforced the covenant to prohibit Harris's employment with the employer's competitor, ICN, rather than issue a worldwide injunction, the possible "breach" occurred within an area in which restriction would clearly be reasonable, even though the terms of the agreement imposed a larger and unreasonable restraint. 794 F.2d at 374. Thus, the court upheld the covenant. Id. Further, the Eighth Circuit held: "We have considered Sigma's contention raised on cross-appeal that the district court erred in failing to enjoin Harris from working for ICN *in any capacity* and find it to be without merit." Id. at 375 (emphasis added).

Likewise, this Court discussed the absence of a geographical limitation in Schott v. Beussick, 950 S.W.2d 621, 627 (Mo. Ct. App. 1997). The Court likened the restrictive covenant there to that in Mills, supra, prohibiting employees from soliciting their employer's clients, but otherwise free to practice accounting wherever and whenever they chose. Id. Holding that the lack of a geographic limitation did not render the restrictive covenant unenforceable, the Court noted, "[A]s the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases." Id.

Here, Defendant signed an agreement, which included a section titled, "Competitive Activity," which stated the following:

> I shall not, directly or indirectly (whether as owner, partner, consultant, employee or otherwise), at any time during the period of my employment by the Company and for a period of two years following termination of my employment, regardless of how, when or why my employment ends, and whether my employment is terminated by the Company with cause or without cause, engage in, provide any services or advice to, contribute my knowledge to or invest in any business that is

7

engaged in any work or activity that involves a product, process, service or development which is then competitive with, the same as or similar to a product, process, service or development on which I worked or with respect to which I had access to Confidential Information while with the Company anywhere the Company markets or sells any such product or service.[1]

Under the facts of this case, we apply Whelan, Schott, and Mills, and find the lack of a geographic limitation here renders the non-compete provision unenforceable without accompaniment by any specificity of limitation on the class with whom contact is limited. Rather, the non-compete provision creates a global prohibition in which Sigma attempted to ban employees from working for any of its competitors globally in any capacity. Rather than a valid prohibition of unfair competition by misuse of Sigma's trade secrets or misuse of the employee's customers' contacts developed at its expense, the Agreement signed here is an unlawful restraint on Defendant's right to compete.

The trial court did not err in holding that the Agreement was unenforceable and denying injunctive relief on the ground that it did not contain a geographic or other non-temporal restriction. The trial court also did not err by using its discretion and refusing to modify the Agreement. Sigma's first point is denied.

*Protecting interests beyond "mere competition"*

Sigma's second point on appeal alleges the trial court erred in holding the Agreement was unenforceable and in denying injunctive relief on the ground that the competition between Sigma and Alfa is "generic, macro-economic, and general," "does not pose a threat to Sigma," and does not rise above "mere competition" to the "level protected by" the Agreement. Sigma argues in

---

[1] The Agreement defines "Confidential Information" to include:
    all technical and business information of the Company . . . which is of a confidential, trade secret and/or proprietary character and which is either developed by me (alone or with others) or to which I shall have had access during my employment." It includes "processes, . . . pricing, . . . information regarding costs, margins and operating unit financial performance, marketing and business plans and strategies, pricing strategies, and customer and supplier lists," as well as "information concerning . . . customers, . . . and customer preferences, contact information, key contacts, . . . and purchasing requirements and preferences.

this point that, because Defendant possesses Sigma's confidential information, Defendant's role at Alfa involves more than "mere competition" with Sigma, and, because Alfa sells products that compete with products about which Defendant has confidential information, the Agreement's protections are triggered. Similarly, in its third point, Sigma argues it met its burden of proof that Defendant is in possession of Sigma's current confidential or trade secret information which would present a current threat to Sigma if known to Alfa.

As stated supra, a non-compete agreement must be narrowly tailored temporally and geographically and must seek to protect legitimate employer interests beyond mere competition by a former employee. Darr v. Roberts Mktg. Group, LLC, 428 S.W.3d 717, 726 (Mo. App. E.D. 2014) (citing Whelan, 379 S.W.3d at 841-42). Accordingly, a non-compete agreement is enforceable only to the extent that the restrictions protect the employer's trade secrets or customer lists. Id. Finding that the Agreement here does not protect the employer's trade secrets or customer lists, the trial court did not err in finding the Agreement failed to rise above "mere competition."

Sigma does not argue its non-compete agreement sought to protect its customer lists, and the evidence showed that Defendant had limited contact with Sigma's customers. Therefore, we focus our analysis on whether the non-compete agreement was narrowly tailored such that the restrictions protect the employer's trade secrets.

A "trade secret" can be "'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" Brown v. Rollet Bros. Trucking Co., Inc., 291 S.W.3d 766, 776 (Mo. App. E.D. 2009) (quoting Nat'l Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 18-19

(Mo. banc 1966).[2] Some factors to be considered in determining whether certain information is a trade secret are:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Brown, 291 S.W.3d at 776 (quoting Cont'l Research Corp. v. Scholz, 595 S.W.2d 396, 400-01 (Mo. App. E.D. 1980)). See also Nat'l Rejectors, 409 S.W.2d at 18-19. Evidence of purported "trade secrets" must be more than general assertions, but must be sufficiently specific to allow a determination by the court. Id. Matters of public knowledge or information that are generally known within a given industry cannot be appropriated as a trade secret. Brown, 291 S.W.3d at 776. "The protection does not extend to knowledge that is the natural product of the employment or known throughout the industry . . . ." Victoria's Secret Stores, Inc. v. May Dept. Stores Co., 157 S.W.3d 256, 262 (Mo. App. E.D. 2004).

The items Sigma wishes to protect are not trade secrets. The evidence showed that Defendant worked at Sigma for more than seven years in several different director positions within the Research unit, which sells more than 35,000 products used by research chemists through the Aldrich Chemistry Catalog. While a director of global strategic accounts, Defendant

---

[2] The Missouri Uniform Trade Secrets Act defines "trade secret" in Section 417.453(4), RSMo (2000), as follows:
> (4) "Trade secret", information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that:
>> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

This definition has also been used in analyzing trade secrets as a basis for enforcing covenants not to compete. Brown, 291 S.W.3d at 776 n.2.

worked on Sigma's 2008 strategic planning team and recommended implementing "Science Place," an online, "Amazon-like" marketplace for selling thousands of products, including Sigma's chemical synthesis products and those procured from third parties, to laboratory scientists. Defendant developed and implemented ideas generated during the 2008 strategic planning process, including expanding the variety of sizes and volumes in which Sigma could package and ship chemicals to meet customers' needs; he also worked on the "Science Place Business Plan" and how to bring the Science Place to market.

The evidence further showed that in 2010, Defendant was responsible for the "user experience" on Sigma-Aldrich.com. He and his team worked on upgrading the appearance for marketing products and acquired an understanding of Sigma's customers and their purchasing habits, needs, and preferences by interviewing scientists using the website. The newly-designed website rolled out in 2010, but Defendant continued to work on it through 2012. In 2012, Defendant worked on another idea from the 2008 strategic planning, the Aggregation Business Plan, the "mechanics" to aggregate both its own and other vendors' products to "simplify the procurement process" for customers. To execute the aggregation strategy, Sigma had to identify vendors, develop a pricing strategy to sell third-party products, and study whether Science Place would meet customers' needs and purchasing patterns. Through the implementation or "publication" of Science Place, from 2012 to 2013, Sigma sells the products of more than 10,000 vendors, including Alfa. Defendant played an important role in the website renovation and significant modifications within the previous three years.

In considering the relevant factors to determine whether something is a trade secret rather than just confidential information, we note that the public knew of the Science Place and Aggregation Business Plan. The "legwork necessary to implement Science Place" resulted in

11

"publication" of the ideas. Moreover, the evidence also showed that Defendant's former employer and Sigma competitor, VWR, also had a website and aggregation strategy combination, and "invented" the idea. Defendant had knowledge of how VWR put it together, and therefore, the strategy cannot be viewed as a trade "secret." Additionally, nothing prohibited a competitor from doing the "legwork" again, including customer interviews, which were not secret. Although it is undisputed that Sigma and Alfa compete in the chemical synthesis industry, the evidence showed that Alfa did not plan to launch anything similar to Science Place; Alfa out-sourced its online services to an external company. Moreover, the global manager of Alfa, who had worked in the same general manager role that Defendant was entering at Alfa, credibly explained that Defendant would have minimal responsibility for the details and day-to-day management of profit and loss; Defendant's position as GM is an oversight function to run and manage the team rather than market and sell. Defendant also would be expected to implement Alfa's strategic plans to which Alfa was already committed.

Sigma did not meet its burden in demonstrating that the information Defendant possessed was not known outside the business, that the information was not widely known within the company or to others involved in the business, or that Sigma had taken measures to guard the secrecy of the online marketplace and aggregation of such. Sigma further did not meet its burden in showing the value of the information to Sigma and to competitors, the amount of effort or money it had expended to develop the information, and that it would be difficult for another company to duplicate or acquire the information. See Healthcare Servs., 198 S.W.3d at 611. We conclude Sigma did not establish that the information it sought to protect constituted a trade secret or protectable confidential information.[3]

---

[3] Sigma also complains that the trial court used terms such as "mere competition" to re-invent non-competition law. However, we find the trial court's terminology is consistent with that used to make a determination of "trade

12

The trial court did not err in holding the Agreement was unenforceable and denying injunctive relief.  Sigma's second and third points are denied.

### III.  Conclusion

The judgment of the trial court is affirmed.

_____
ROY L. RICHTER, Judge

Patricia L. Cohen, P.J., concurs
Robert M. Clayton III, J., concurs

---

secrets."  The evidence here was not "more than general assertions," and was not "sufficiently specific to allow a determination [of trade secrets] by the court."  Healthcare Servs., 198 S.W.3d at 611.