

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| JEFFERSON CITY MEDICAL GROUP, P.C., | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | **WD86589** |
| | ) | |
| DAVID BRUMMETT, | ) | **Filed: April 9, 2024** |
| | ) | |
| Appellant. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
### THE HONORABLE DANIEL GREEN, JUDGE

### BEFORE DIVISION THREE: MARK D. PFEIFFER, PRESIDING JUDGE,
### LISA WHITE HARDWICK, JUDGE, AND W. DOUGLAS THOMSON, JUDGE

David Brummett appeals from a judgment for an injunction enforcing a noncompete clause in his employment agreement with Jefferson City Medical Group, P.C. ("JCMG"). Brummett contends: (1) the circuit court erred in concluding the noncompete clause protects a legitimate interest of JCMG; (2) no substantial evidence supports the court's finding of irreparable harm or an inadequate remedy at law warranting the injunction; (3) the court erred in concluding JCMG had not previously materially breached the employment agreement; and (4) the court erred in awarding attorney's fees to JCMG. Both parties request attorney's fees for this appeal. For

reasons explained herein, we affirm the judgment and remand the case to the circuit court to determine the appropriate amount of attorney's fees for this appeal to award JCMG.

## FACTUAL AND PROCEDURAL HISTORY

In July 2015, Brummett entered into a non-shareholder physician agreement with JCMG, the largest physician group in the Jefferson City area, to work as a radiologist in JCMG's Radiology Division ("JCR Division"). A year later, on July 21, 2016, Brummett entered into a physician agreement to become a shareholder of JCMG and a member of the JCR Division. Including Brummett, there were six radiologists in the JCR Division.

The physician agreement had a noncompete clause. In the noncompete clause, Brummett agreed that, for two years after the termination of the physician agreement, he would not practice radiology within a 25-mile radius of the city limits of Jefferson City, excluding Columbia, and would not seek to solicit, perform services for, contact, entice, divert, induce, or otherwise seek to take away any patients of JCMG or other health care provider business from JCMG. Brummett further agreed that engaging in the practice of radiology within the restricted territory on behalf of anyone for a period of two years after termination "by its very nature, results in the solicitation of JCMG patients in violation of these covenants."

JCMG, through the JCR Division, began providing radiology services to SSM Health St. Mary's Hospital – Jefferson City ("St. Mary's") in 1995. Over the years, there were numerous amendments and restatements of JCMG's radiology services contract with St. Mary's. At times, JCMG would provide notice of nonrenewal or termination of the contract as a negotiating tactic. Due to the instability of JCMG's contract with St.

2

Mary's, Brummett's physician agreement had a "last-in/first-out" clause. This clause provided that, in the event the St. Mary's contract was terminated, JCMG could terminate his employment 12 months after the termination of the St. Mary's contract. Another JCR Division radiologist hired around the same time as Brummett also had the same "last-in/first-out" clause in his physician agreement. Additionally, per their physician agreements, neither Brummett nor his contemporary were allowed to vote on any decision to terminate the St. Mary's contract. Brummett knew and understood when he became a shareholder that there was a risk that the St. Mary's contract would be terminated and that he could lose his employment with JCMG as a result.

Through his employment with the JCR Division of JCMG, Brummett served as the medical director of radiology for St. Mary's and, in 2018, he became the medical director for St. Mary's stroke program. In 2020, however, the JCR Division members, including Brummett, began complaining among themselves about the working conditions at St. Mary's. These complaints included their inability to read St. Mary's films from home; the poor payor mix; St. Mary's 24/7 coverage requirements, which included weekends; having to work 10-hour days due to emergency room volume; and below market contract compensation terms, which resulted in the JCR Division being unable to recruit new radiologists. During a meeting on October 13, 2020, JCR Division members discussed their concerns and complaints about the St. Mary's contract and decided to vote on whether they should terminate the contract or try to negotiate changes to it. Before taking the vote, the then-voting JCR Division members agreed to allow Brummett and his contemporary to vote on the issue as well. Brummett, his contemporary, and two other

members vocalized their opinions against taking any action. No financial data about the St. Mary's contract was presented during this meeting. The JCR Division members voted not to pursue taking any action to terminate or renegotiate the St. Mary's contract at that time.

Because the St. Mary's contract was expiring on its own terms on December 31, 2020, the JCR Division decided to enter into a fourth amendment to its radiology services agreement with St. Mary's. The fourth amendment extended the contract for another three years and did not materially change the contract's terms. Around this same time, Brummett signed a discretionary bonus agreement with JCMG acknowledging and reaffirming the enforceability of the noncompete clause in his physician agreement in exchange for $139,000.

The fourth amendment to the JCR Division's radiology services agreement with St. Mary's did not alleviate the JCR Division members' concerns and complaints about their relationship with St. Mary's; in fact, those concerns and complaints worsened. The chair of the JCR Division gathered financial data concerning the St. Mary's contract and called a meeting of JCR Division members to review the data. All of the JCR Division members attended the April 21, 2021 meeting in person except Brummett, who chose to participate by phone. During the meeting, the chair presented financial information showing that the St. Mary's contract rates were 20 to 30% below JCMG rates, the cost to the JCR Division for its teleradiology subcontractor to read scans was increasing by $144,000, and if the St. Mary's contract was terminated, the worst case scenario was that all radiologists' compensation would be cut by approximately 40 to 50% and their work

4

days would also be significantly reduced. No vote regarding the St. Mary's contract was taken during this meeting.

A meeting for the JCR Division members to vote on whether to terminate the St. Mary's contract was scheduled for May 4, 2021. The chair advised everyone that all of JCMG's data and financial resources were available to them for their own review and verification, and he advised everyone to review the information before the vote. Because Brummett had not attended the April 21, 2021 meeting in person, the chair met with Brummett on April 27, 2021, to personally review the St. Mary's contract financial data with him.

All of the JCR Division members participated in the May 4, 2021 meeting in person, and all had the authority to vote. No member, including Brummett, discussed how they were planning to vote, and no member tried to encourage or sway any particular vote. All of the members knew the risks involved, including the potential change in their compensation and work schedules, if the St. Mary's contract was lost. Knowing this, all six of the JCR Division members, including Brummett, voted unanimously to terminate the St. Mary's contract and to negotiate new, more acceptable terms. Brummett expressed no objection before, during, or after the vote to terminate and renegotiate the St. Mary's contract.

The next day, the JCR Division chair drafted a letter to St. Mary's terminating the contract effective November 1, 2021. He provided the draft to the JCR Division members before sending it to St. Mary's. No one, including Brummett, offered comments or objected to the letter. On May 6, 2021, the chair sent a second letter to St.

5

Mary's advising of the terms that JCMG desired in a new contract. Again, Brummett and the other JCR Division members were given a draft of the letter before it was sent, and Brummett did not raise any concerns. St. Mary's did not respond to the May 6, 2021 letter and gave no indication it was willing to negotiate with JCMG.

Because it looked like the St. Mary's contract was going to be terminated, Brummett signed an amendment to his physician agreement on July 1, 2021, that removed the "last-in/first-out" clause that termination of the St. Mary's contract would trigger. The other members of the JCR Division decided that removing this clause from Brummett's and his contemporary's physician agreements was fair, and the other members wanted to reassure Brummett and his contemporary that, no matter what happened with the St. Mary's contract, they would not lose their jobs. In this amendment, Brummett also reaffirmed his physician agreement's remaining covenants, which included the noncompete clause.

On August 13, 2021, the president of St. Mary's told the chair of the JCR Division that St. Mary's was going to go "in a different direction" and was not going to enter into a new contract with JCMG for radiology services. The St. Mary's president followed up this conversation on September 23, 2021, with an official letter advising JCMG that St. Mary's radiology services would be provided by Ernst Radiology Group ("Ernst") beginning November 1, 2021, and Brummett would be replaced as medical director of St. Mary's stroke program.

In light of this news, the medical director of the JCR Division implemented a new work schedule and assigned duties, including film reading, performing procedures,

6

administrative duties, and practice-building duties, for the JCR Division members. When the termination of the St. Mary's contract became effective, the JCR Division's work schedule and location would automatically be limited to providing only outpatient radiology services at JCMG, which reduced members' film reading and procedures by 40 to 50% of what they had been when the JCR Division had the St. Mary's contract.

In anticipation of this change in the work schedule and location, Brummett, who was not interested in practice building to regrow the business lost with the St. Mary's contract, proposed during the September 8, 2021 meeting of the JCR Division that the members approve a new schedule, just for him, that would allow him to work at JCMG only two days a week so he could work at a second job site three days a week. Brummett's request to work outside of JCMG was not allowed under his physician agreement without JCMG's permission. Despite Brummett's request being "unprecedented," his fellow JCR Division members wanted to make him happy and keep him in the group. Ultimately, on September 21, 2021, Brummett and the other JCR Division members agreed that he would work at JCMG three days a week and at Moberly Medical Clinics, Inc., ("Moberly") two days a week, subject to a six-month review period, after which the JCR Division could rescind its approval if the schedule proved unworkable.

Brummett also wanted an exemption from the JCMG outside income policy in his physician agreement. He presented a memorandum to the JCMG Board of Directors requesting that all of the money he earned from Moberly go directly to him instead of flowing through JCMG and being subject to an assessment for accounting and services

7

within the JCMG organization. The chair of the JCR Division and another JCR Division radiologist supported Brummett's request to the JCMG Board. The JCMG Board approved Brummett's request for the exemption from the outside income policy. Consequently, none of the money Brummett earned from Moberly went to JCMG. Brummett made no other requests or demands of JCMG with regard to his employment or his work schedule.

Unbeknownst to JCMG, before the end of the St. Mary's contract and before Brummett started working two days a week at Moberly, he began communicating with the president of Ernst in October 2021. Ernst wanted Brummett to work for Ernst at St. Mary's, performing both inpatient and outpatient radiology services, as he had worked for JCMG when it had the St. Mary's contract. While discussing employment opportunities with Ernst, Brummett informed the president of Ernst that he had a noncompete clause with JCMG that he believed would prevent him from practicing radiology for Ernst at St. Mary's. The president of Ernst told Brummett that he would have Ernst's attorney see if he could get Brummett out of JCMG's noncompete clause.

On January 7, 2022, Brummett provided the chair of the JCR Division oral and written notice that he was terminating his contract with JCMG for cause, effective January 31, 2022.[1] In his written notice, which Ernst's attorney assisted him in drafting, Brummett asserted that his physician agreement stated that he was to practice medicine

---

[1] Brummett's physician agreement provided that the agreement could be terminated by mutual written agreement of the parties without cause or by Brummett without cause on 180 days' written notice.

with JCMG on a full-time basis and that JCMG's voluntary termination of the St. Mary's contract "necessarily resulted in a schedule that is obviously in direct conflict with that contractual provision."

On the same day Brummett notified JCMG that he was terminating his physician agreement, he entered into an employment agreement with Ernst. His employment agreement with Ernst is not contingent upon his JCMG's noncompete clause being voided. While working for Ernst, it is anticipated that Brummett will earn approximately $1,000,000 per year.

After JCMG learned that Brummett was working for Ernst at St. Mary's, JCMG filed an application for a temporary restraining order and preliminary and permanent injunctive relief. In the application, JCMG asserted Brummett violated the noncompete clause by performing radiology services and engaging in the practice of radiology within the restricted territory. Following a hearing, the court entered a temporary restraining order on February 1, 2022, prohibiting Brummett from working for Ernst at St. Mary's. In his second amended answer, filed after the entry of the temporary restraining order, Brummett asserted, *inter alia*, that JCMG had materially breached the physician agreement prior to his alleged breach by failing to provide him full-time employment after November 1, 2021, and by "promoting an unprofessional and hostile environment and violating important policies and regulations, thus endangering the reputations and ability to practice of anyone associated with the group, including Dr. Brummett."

A bench trial was held in March 2022. In May 2022, the court entered its judgment enjoining Brummett from engaging in the practice of radiology for Ernst or any

9

other entity within a 25-mile radius of Jefferson City, excluding Columbia, and from providing radiology services to St. Mary's, either in person or remotely, for two years. The court further determined JCMG did not breach Brummett's physician agreement. Because Brummett terminated the agreement without cause and without providing the 180-day notice as required in the agreement, the court concluded the time period for the two-year noncompete clause would run from July 29, 2022, through July 29, 2024. Lastly, the court ordered Brummett to pay, pursuant to a provision in his physician agreement, JCMG's reasonable attorney's fees incurred in the enforcement of the noncompete clause, in an amount to be determined by the court, and JCMG's court costs.

Brummett appealed. After briefing and oral argument, we dismissed this appeal for lack of appellate jurisdiction because the judgment reserved decision on the amount of attorney's fees and costs to be awarded and, therefore, was not a final judgment. *Jefferson City Med. Grp., P.C. v. Brummett*, 665 S.W.3d 380, 388 (Mo. App. 2023). On remand, the parties litigated the amount of attorney's fees, including whether JCMG was entitled to attorney's fees incurred for the first appeal and its fee motion. The court entered an amended judgment awarding JCMG attorney's fees and costs totaling $443,511.00, which included $152,030.50 in fees for the first appeal, and $32,690.50 in fees for the fee motion. Brummett appeals.

10

An action for an injunction is an equitable action.  *Cty. of Boone v. Reynolds*, 549 S.W.3d 24, 28 (Mo. App. 2018).  "The standard of review in a court-tried equity action is the same as for any court-tried case; the trial court's judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law."  *City of Greenwood v. Martin Marietta Materials, Inc.*, 311 S.W.3d 258, 263 (Mo. App. 2010) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)).  We view the evidence in the light most favorable to the judgment, disregard all contrary evidence, and defer to the circuit court's credibility determinations.  *Dash v. Taylor*, 668 S.W.3d 580, 584 (Mo. App. 2023).  We review questions of law, which include the interpretation of a restrictive covenant, de novo.  *Id*.

ANALYSIS

In Point I, Brummett contends the circuit court erred in granting an injunction enforcing the noncompete clause in his physician agreement because it erroneously concluded that JCMG has a legitimate interest in its patient and referral base that is protected by the noncompete clause.  Brummett argues there is no base of consistent recurring patients to protect, and referrals by non-patients are not a legitimate protectable interest under Missouri law.

Missouri courts will enforce noncompete agreements that are "demonstratively reasonable."  *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841 (Mo. banc 2012).  A demonstratively reasonable noncompete agreement "must be narrowly tailored temporally and geographically and must seek to protect legitimate employer interests

11

beyond mere competition by a former employee." *Id*. at 841-42. "Accordingly, a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.'" *Id*. at 842 (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. banc 2006)). "The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space." *Id*.

Brummett does not dispute that the noncompete clause's terms of two years and within a 25-mile radius of Jefferson City (excluding Columbia) were reasonable as to time and geographic space. He argues only that JCMG failed to prove the noncompete clause protects a legitimate business interest, namely, JCMG's customer contacts. "An employer has a legitimate interest in customer contacts to the extent it seeks to protect against 'the influence an employee acquires over his employer's customers through personal contact.'" *Id*. (quoting *Copeland*, 198 S.W.3d at 611). A customer is defined as "one who repeatedly has business dealings with a particular tradesman or business." *Id*. (quoting *Silvers, Asher, Sher & McLaren, M.D.s Neurology, P.C. v. Batchu*, 16 S.W.3d 340, 345 (Mo. App. 2000)). "Customer contacts are a protectable commodity because goodwill develops between the customers and the employer through its employees whose job it is to meet and converse with the customer while representing the employer." *Brown v. Rollet Bros. Trucking Co.*, 291 S.W.3d 766, 774 (Mo. App. 2009) (citation omitted). As this court explained:

12

> The goodwill that develops from customer contacts between the salesman or business partner and the company's customer is essential to the compan[y's] success and is the reason the employee or the business partner is remunerated. The goodwill that develops results in sales of the company's product or services. Therefore, an employer has a protectable right in both customers and goodwill.

*AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 720 (Mo. App. 1995). "The purpose of a non-compete agreement is 'to keep the covenanting employee out of a situation in which he might be able to make use of contacts with customers to his former employer's disadvantage.'" *Copeland*, 198 S.W.3d at 611 (quoting *Osage Glass v. Donovan*, 693 S.W.2d 71, 75 (Mo. banc 1985)). "[A]n employee's ability to influence customers depends on the 'quality, frequency, and duration of an employee's exposure to an employer's customers, which is crucial in determining the covenant's reasonableness.'" *Kennebrew*, 379 S.W.3d at 842 (quoting *Copeland*, 198 S.W.3d at 611). The former employee's position with the employer is also relevant to this determination. *Id.*

In its judgment, the court found that JCMG has a legitimate protectable interest in its patient and referral base. Looking first at Brummett's patient base, three JCR Division members, including its chair, testified that JCMG has patients who would follow Brummett to Ernst if the noncompete clause is not enforced. One JCR Division member testified that he personally had patients follow him from his prior employer to JCMG when JCMG hired him, and he "know[s] for a fact" that patients would follow Brummett from JCMG to Ernst if the noncompete clause is not enforced. Additionally, in the noncompete clause, Brummett expressly agreed that his engaging in the practice of radiology within the restricted territory on behalf of anyone for a period of two years

13

after termination "by its very nature, results in the *solicitation of JCMG patients* in violation of these covenants." (Emphasis added.)

Nevertheless, Brummett argues that JCMG's interest in its patient base is insignificant because radiologists rarely have contact with patients, the interaction they do have with patients is limited in scope and duration, and they do not typically have repeat patients. It is precisely because of the nature of the practice of radiology, however, that JCMG also has a legitimate protectable interest in its referral base. The evidence in this case shows that, because radiologists do not usually have extended relationships with their patients, they rely heavily on referrals from physicians for patients. Consequently, the survival of an outpatient radiology practice, which is what JCMG became after the termination of the St. Mary's contract, depends upon maintaining the goodwill and relationships its radiologists have cultivated with referring physicians. Indeed, one JCR Division member testified that both the patient *and* the referring physician are the radiology practice's customer.

Brummett acquired his customers, *i.e.*, his patient and referral base, from the JCR Division, because when he joined, he lived in Columbia, had not practiced in the Jefferson City area, and was not familiar with physicians in the community. According to one JCR Division member, the JCR Division "pay[s] a lot" to bring new radiologists in, providing them a referral base and giving them "all they need to practice." The JCR Division members invested their time and effort into introducing Brummett to physicians and patients and helping him establish relationships with those physicians and patients. They allowed Brummett time to meet with physicians in the area to explain the type of

14

procedures he could do, and JCMG compensated him while he did these practice-building activities. Eventually, because of JCMG's contacts at St. Mary's, JCMG put Brummett in hospital directorship positions for the purpose of further developing a patient and referral base. Brummett represented to the JCR Division members that he would use the relationships he built with hospital administrators and practitioners through those directorships to increase the volume of the JCR Division's practice at the hospital. According to one JCR Division member, Brummett "just didn't really work that hard when he was at the hospital" because he was "meeting with people, talking to people in committees, talking to administration, you know, building those relationships."

Over the six and one-half years that Brummett was employed by JCMG, he continued to live in Columbia[2] and grew his patient and referral base because of the connections and support given to him by JCMG, the directorships that JCMG placed him in at the hospital, and the relationships and goodwill that JCMG helped him foster with physicians in the Jefferson City area. The patient and referral base were JCMG's customer contacts. Under the circumstances of this case, allowing Brummett to disregard the noncompete clause and use these customer contacts to compete against JCMG would be unfair.[3] While courts do not enforce noncompete clauses to protect the employer from

---

[2] At the time Brummett chose to work for Ernst at St. Mary's in violation of his noncompete clause, Boone Hospital and the University of Missouri had approached him about working as a radiologist for them. Both facilities are located in Columbia, his city of residence, and would not have violated his noncompete clause.

[3] We recognize that in *Steamatic of Kansas City, Inc. v. Rhea*, 763 S.W.2d 190, 193 (Mo. App. 1988), this court stated that a company that provided cleaning services for disaster restoration had no protectable interest in the goodwill of insurance adjusters who referred customers to the company because it was the customers, not the insurance adjustors, who decided which company

15

mere competition by a former employee, they do to protect the employer from *unfair*

competition. *Id*. at 843. The circuit court did not err in finding JCMG has a legitimate

interest in its patient and referral base that is protected by the noncompete clause. *See*

*Ballesteros v. Johnson*, 812 S.W.2d 217, 223 (Mo. App. 1991).[4] Point I is denied.

In Point II, Brummett contends the circuit court erred in granting the permanent

injunction because no substantial evidence supports a finding of irreparable harm or an

inadequate remedy at law if the noncompete clause is not enforced. To be entitled to an

injunction, a party must prove "that it had no adequate remedy at law and that irreparable

harm would have resulted if the injunction was not granted." *Sigma-Aldrich Corp. v.*

*Vikin*, 451 S.W.3d 767, 771 (Mo. App. 2014).

The evidence on this issue is that, within the noncompete clause's restricted

territory, the JCR Division, Ernst at St. Mary's, and two other radiology groups perform

outpatient radiology services. Brummett performs the same, or substantially similar,

outpatient services as the JCR Division radiologists perform. Physicians, including

JCMG physicians in divisions other than the JCR Division, can refer patients to

---

to employ and were responsible for payment. The difference between *Steamatic* and this case is that here, the record indicates that the decision to employ a particular radiologist covered by the patient's insurance is made jointly by the referring physician and the patient, and JCMG invested a significant amount of time, money, and effort in developing and fostering Brummett's relationships with referring physicians.

[4] *See also Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 769, 112 P.3d 81, 90 (2005) (holding that a medical practice had a legitimate business interest in protecting its referral relationships, as employee physicians "benefitted from their association and from the investment of [the practice] and its contribution of goodwill"); *Med. Specialists Inc., v. Sleweon*, 652 N.E.2d 517, 523 (Ind. Ct. App. 1995) (holding that "the continued success of the practice, which is dependent upon patient referrals, is a legitimate interest worthy of protection").

16

whichever radiology service provider they choose; therefore, the JCR Division, Ernst at St. Mary's, and the two other radiology groups are in competition with each other for this outpatient business.

The JCR Division chair confirmed that, if Brummett were allowed to work for Ernst at St. Mary's, he would be competing for outpatient business that the JCR Division could perform and he "would be very, very good at doing that." The chair further testified that, after Brummett left the JCR Division, the JCR Division received several calls from physicians' offices trying to schedule cases with Brummett when they believed he was going to be working at St. Mary's. Another JCR Division member testified that St. Mary's physicians and "every doctor" practicing in the other divisions at JCMG will refer their radiology patients to Brummett because of the relationships the JCR Division helped Brummett create and maintain. According to the same JCR Division member, the foundation of JCMG is the noncompete clause, and it is the only thing keeping the group solvent. He testified that, without the noncompete clause, the group will eventually dissolve, because it "will be subject to the predatory practices of other groups, other companies, billion-dollar companies." This evidence, which the circuit court was free to accept, is sufficient to support a finding of irreparable harm and an inadequate remedy at law if the noncompete clause is not enforced. Point II is denied.

In Points III and IV, Brummett argues the court erred in enforcing the noncompete clause because JCMG had materially breached his physician agreement. "An employer that has materially breached an employment agreement before an employee has violated a covenant not to compete may not enforce the covenant." *Washington Cty. Mem'l Hosp.*

17

*v. Sidebottom*, 7 S.W.3d 542, 546 (Mo. App. 1999). This is because a party cannot seek to enforce the benefits of a contract if that party is the first to violate its terms. *JumboSack Corp. v. Buyck*, 407 S.W.3d 51, 57 (Mo. App. 2013). "An employer's unilateral change to an employment agreement may constitute a material breach of the agreement if it substantially alters the manner and/or amount that the employer pays the employee." *Id*. Whether the employer has materially breached the employment agreement is largely a question of fact reserved for the circuit court. *Id*.

Brummett asserts in Point III that JCMG unilaterally changed his physician agreement by undermining his ability to practice medicine 40 hours a week as required by the agreement; failing to satisfy his reasonable compensation expectations; materially changing the nature of his work duties and compensation; and allowing the other JCR Division members to breach their own work-hour commitments. None of these changes were breaches of Brummett's physician agreement, however. The agreement did not guarantee Brummett a set amount of compensation or number of hours he would spend performing billable work, such as reading films or performing procedures. Additionally, the agreement allowed JCMG to assign him other duties, like practice building and other administrative duties, "from time to time," and the physician agreement stated that Brummett's obligation to practice 40 hours a week would be "subject to" JCMG's assigning him these other duties.

Furthermore, none of these changes were made unilaterally by JCMG, which distinguishes this case from *McKnight v. Midwest Eye Institute of Kansas City, Inc.*, 799 S.W.2d 909, 916 (Mo. App. 1990), the case on which Brummett primarily relies. All of

18

the changes to Brummett's and the other JCR Division members' compensation, work schedules, and duties were the direct result of the termination of the St. Mary's contract, for which Brummett, along with the other JCR Division members, unanimously voted. The vote occurred after several discussions between all of the JCR Division members and after the JCR Division chair provided everyone, including Brummett, detailed information about the financial and practical consequences of terminating the contract. On the day of the vote, Brummett did not voice any concerns or provide any negative feedback about terminating. Substantial evidence shows that Brummett mutually agreed with JCMG to terminate the St. Mary's contract with full knowledge of and acquiescence to the impact the termination would have on his compensation, work schedule, and duties. Thus, even if the changes to Brummett's compensation, work schedule, and duties resulting from the termination of the St. Mary's contract were breaches of his physician agreement, which they were not, he could not use them to justify his breach of the noncompete clause. "[O]ne who waives a breach of the contract cannot set it up in justification of his own breach." *Long v. Huffman*, 557 S.W.2d 911, 915 (Mo. App. 1977).[5] Point III is denied.

In Point IV, Brummett argues JCMG materially breached the physician agreement by exhibiting unprofessional conduct. He notes that every JCR Division member promised in their physician agreements to "adhere faithfully to all professional ethics and

_____

[5] Brummett argues that his acquiescence to and vote for the termination of the St. Mary's contract does not constitute a waiver because any opposition he might have voiced before the vote would have been futile. To support this argument, he offers his testimony to that effect. Clearly, the court rejected this testimony, and we defer to its credibility determination.

19

customs" and "avoid all conduct which might injure in any way, directly or indirectly, the professional reputation of JCMG or any of the physicians or other employees of JCMG." Brummett contends the JCR Division members breached these promises by making xenophobic and discriminatory statements about minority radiologists, which became known to St. Mary's management, and by encouraging JCR Division members to use St. Mary's patient data improperly after terminating the St. Mary's contract. Brummett asserts these actions damaged his professional reputation and entitled him to leave the group to pursue employment elsewhere, rendering the noncompete clause unenforceable. We disagree.

The evidence shows the majority of the statements at issue were made during a one-time text conversation exclusively between JCR Division members, including Brummett, who did not complain about the statements to anyone in the JCR Division during or after the text conversation. There is no evidence the text conversation was published to anyone at St. Mary's or to anyone outside of the JCR Division members.

The other statement at issue was allegedly made by the JCR Division chair. Brummett testified he was told by a St. Mary's employee that the JCR Division chair made an offensive statement to another St. Mary's employee. The record does not indicate what the offensive statement was, and St. Mary's did not speak to or take any action against the chair for making the statement. The circuit court was free to disbelieve Brummett's self-serving testimony.

As for Brummett's claim that the JCR Division leadership improperly instructed members to access outpatient schedules to generate referrals away from St. Mary's, there

was evidence that the purpose for accessing the schedules was to preserve continuity of patient care. Indeed, St. Mary's corporate designee testified that St. Mary's looked into the situation, did not intend to refer any JCR Division members for HIPAA violations, and understood that the JCR Division members had a right to ensure continuity of care with respect to any future testing done on their patients.

Notably, Brummett raised no concerns about possible harm to his reputation stemming from these statements and actions until after the court's entry of the temporary restraining order enforcing the noncompete clause. In fact, in his resignation letter, Brummett stated that his "time with JCMG ha[d] been rewarding and filled with substantial professional growth." Viewed in the light most favorable to the judgment, the evidence does not indicate that any of the alleged statements or actions of the JCR Division members were detrimental to Brummett's professional reputation or otherwise entitled him to seek employment elsewhere in violation of the noncompete clause. The circuit court did not err in concluding that JCMG did not breach Brummett's physician agreement. Point IV is denied.

In Point V, Brummett contends the circuit court erred in awarding JCMG its attorney's fees relating to the first appeal, which was dismissed for lack of jurisdiction, and attorney's fees relating to JCMG's motion for attorney's fees.[6] The court awarded JCMG its attorney's fees and costs based on language in the noncompete clause stating

---

[6] Brummett also asserts in this point that, if we find the noncompete clause is unenforceable, then he, not JCMG, is entitled to an award of attorney's fees as the prevailing party. As discussed *supra*, the noncompete clause is enforceable, and Brummett is not the prevailing party.

21

that, if Brummett breached or threatened to breach any provision of the noncompete clause, then JCMG would be entitled to injunctive relief, damages, attorney's fees, costs, and expenses.

When a claim for attorney's fees is made pursuant to a contractual provision, the circuit court must comply with the contract's terms. *Brown v. Brown-Thill*, 437 S.W.3d 344, 348 (Mo. App. 2014). The court has no discretion whether to award attorney's fees that are recoverable by contract, and its failure to award such fees is erroneous. *Id*. at 348-49.

Brummett argues the court erred in awarding JCMG the attorney's fees it incurred in the first appeal. He asserts that, because the first appeal was dismissed for lack of a final appealable judgment, JCMG was not a "prevailing party" in that appeal and, therefore, was not entitled to recover its fees. Although the noncompete clause does not expressly require JCMG to prevail to recover its fees, the law in Missouri is that, "even if the contract is silent on the issue, a party may only recover its fees under a contract provision if it is a prevailing party." *Id*. at 350 n.4 (citation omitted).

A "prevailing party" for the purposes of a contractual award of attorney's fees is "the party prevailing on the main issue in dispute." *Parkway Constr. Servs., Inc. v. Blackline LLC,* 573 S.W.3d 652, 667 (Mo. App. 2019) (citation omitted). The "main issue" in dispute at all stages of this litigation has been the enforceability of the noncompete clause in Brummett's physician agreement. JCMG was the prevailing party on this issue in the original judgment, was required to defend itself on this issue in the first appeal, and remained the prevailing party on this issue after the dismissal of the first

22

appeal.[7]  The court did not err in awarding JCMG the attorney's fees it incurred in defending itself in the first appeal.

Brummett next argues the circuit court erred in awarding JCMG fees for preparing the attorney's fee motion.  He asserts such fees are not recoverable, but he cites no relevant case law to support this assertion.  Because the physician's agreement provides for the recovery of attorney's fees, and Brummett has offered no legal reason prohibiting the recovery of these particular fees, the circuit court did not err in awarding JCMG its fees incurred in obtaining the fee award.  Point V is denied.

Both parties request attorney's fees for this appeal.  As the prevailing party, JCMG is entitled to attorney's fees for this appeal pursuant to the physician's agreement.

### CONCLUSION

The judgment is affirmed, and the cause is remanded to the circuit court to determine the appropriate amount of attorney's fees for this appeal to award JCMG.  *See Brown v. Pfeiffer*, 682 S.W.3d 45, 55 n.5 (Mo. App. 2024) (stating the circuit court is better equipped than this court to hear evidence and determine a reasonable award for attorney's fees on appeal).

_____
LISA WHITE HARDWICK, JUDGE

All Concur.

---

[7] Moreover, the reason for the initial appeal's dismissal – the lack of a final judgment because the original judgment reserved decision on the amount of attorney's fees to award JCMG – resulted from Brummett's decision to file a notice of appeal rather than proceed on JCMG's motion to award a specific amount of fees.